1859 36 Priyanka Bose versus Robert De La Salube et al. Oral argument not to exceed 15 minutes per side. Mr. Hanson for the Plaintiff Appellant. Good morning your honors, Adam Hanson representing Appellant Priyanka Bose. I'd like to reserve three minutes for rebuttal. And may it please the court, I want to focus on the Title IX issue although I'm certainly happy to answer any questions about the second defamation issue in the course of this argument. The district court erred in conflating two distinct concepts in this case. First the concept of cat's paw causation and second the legal concepts of responding its superior liability. That was error for the reasons I'll explain and this court should hold that under Title IX a school on notice of a teacher's retaliatory agenda. The facts of this case illustrate this rule in motion. Okay let me just pause you for one minute. So is cat's paw your theory of liability? Cat's paw is our response to defendant's motion for summary judgment on causation. Right. We still have to prove all of the elements of... Of course I'm just I guess I'm just wondering if that is your theory of causation. Yes and I think that's that's the only theory of causation that there could be in this case because you essentially have the the non-final decision-maker here, the teacher professor Bea, who levels the false cheating allegation and then you have the decision-makers ultimately at the school who expel appellant Boas solely on the basis of the cheating allegation. There's no... But and you can correct me if I'm wrong. I thought cat's paw liability came in when the decision-maker here, the expellers, didn't have notice of the discriminatory animus. That's usually how these cases come up. So we're here of the alleged retaliation. So it's an it just seems odd to me. Do you do you claim that... I thought you claimed they had notice. They do have notice so let me... So if they do have notice how is it cat's paw? Well some cat's paw cases involve no notice whatsoever but other cat's paw cases do involve notice. Okay what takes the case out of the realm of cat's paw is, and we cite the cases that say this in our brief, is really a full independent investigation, right? So let me give you an example. You're saying it's not a cat's paw issue. I beg your pardon? You're saying it's not a cat's paw case. This is a cat's paw case. What wouldn't be a cat's paw causation is when the ultimate decision-maker does a complete and independent evaluation of the underlying reason. And in that instance it's no longer a cat's paw case because essentially the decision-maker... I don't understand why you need the cat's paw theory then. You're saying they had actual notice that there was a retaliatory motive that he was making up these documents that was all contrived and they kicked her out of school anyway, right? The cat's paw theory comes into play as long as the decision-maker relies upon the recommendation of the lower-level subordinate. So it doesn't matter. I mean it certainly helps our case that there's notice that, hey, decision-maker, we think that this recommendation is infected by discriminatory animus. But in any scenario, as long as the decision- on the recommendation of the subordinate, cat's paw is in the picture. And this goes to the heart of what the district court got wrong in this case because cat's paw really is... it goes to the question of causation. If I am the decision-maker and I am presented with a recommendation, let's say, to fire somebody or expel somebody, I now have two choices. I can either investigate independently, which did not happen in this case, which would cut off the cat's paw theory, or I can rely on the recommendation of my subordinates. And if I do that, this is what the Supreme Court has said in Staub, I am effectively delegating my decision-making authority to the subordinate. But that seems to me that then you didn't... they didn't have actual notice. If they're relying solely on the recommendation, then they didn't have notice that this was contrived or a retaliation. I don't understand. Like if they either have notice or they don't, right? And so, I mean, it seems like you're using the cat's paw as a substitute for the notice requirement. No, I don't think so. And I would quibble a bit with the premise of that question because it's certainly possible for the decision-maker to have notice and just to say, well, okay, I have the notice, but I'm still going to follow the Isn't that just straight-up deliberate indifference? I mean, I thought cat's paw was about sort of a transferred intent idea. Well, so I think there are two questions there. I don't think cat's paw is about a transferred intent. It doesn't... it's different from responding at Superior in the sense of, you know, an employee who's driving a truck runs somebody over. That negligence is essentially transferred to the principal. Okay, so it's a duping theory. I didn't know. This guy duped me. I thought that... I thought that she had cheated on her test. This guy duped me into believing that she cheated on her test. The cases talk about two prongs, really, duping or willful blindness. So it can be a case... cat's paw applies when it's really a pure case of duping, but it can also apply in sort of the man-in-the-rubber-room case. The sort of, I don't want to know anything, don't tell me anything. Okay, so you must be pursuing the willful blindness. Absolutely, yeah. I mean... Prong of that, rather than the duping prong. Well, I mean, it's... those aren't really operative prongs of the test, as much as sort of the underlying rationale. There's very... yeah, there's very little out there in the way of case law, so we may be making some sort of... Well, I think, you know, this Court is going to have something useful to say. I mean, there are cases out there, obviously, we've cited, but in many of the cases the analysis is limited. So... What's your best case? Are you going on the Gebscher case or some other case? Well, I do want to talk about Gebscher, but our best case is the Second Circuit's decision in Papalino. That case really is identical to this case in all material respects. But they don't really talk about cat's paw in that case. They talk about... It seems to me that it's more of a corporate knowledge concept that they're importing from Title VII, right? I don't think so. I mean, there are elements of Title VII that are analogous under Title IX, and this Court and the Supreme Court have said that. I'm just saying the Second Circuit explicitly relies on Title VII corporate knowledge cases, right? I don't... I'm not sure I'm equipped to answer the question specific to corporate knowledge. I know that the Second Circuit did rely on Title VII, which is appropriate. The only difference is, of course, Title VII relies on an agency theory, which is unavailable under Gebscher for Title IX, which relies on, at least with respect to sexual harassment cases where you have independent acts, that is a deliberate indifference standard. But the Second Circuit talked about that. It cited the Gebscher standard and applied it. And so regardless of the labels that the Second Circuit used, the reality is the Second Circuit looked at a case that's materially identical, really a... Why is it materially identical? Because there the student who was harassed went to his dean. And so I'm wondering what the protected activity is here. So there the student who was harassed went to the dean, somebody arguably in a position to do something about the harassment. Here, what's the protected activity? So, and then the professor finding out about it in the Second Circuit case fails the student, right? Takes a retaliatory action against the student. Here, the student says to the professor, stop harassing me. Is that protected conduct? It would be under Title VII. It is protected conduct. The protected, so two things. First of all, there's no summary judgment challenge to the protected conduct element of retaliation. So that question's not before this court. But to the extent that this court cares about that, absolutely. Reporting the question to her own professor, you know, just going to him and saying, I want you to knock this off, that qualifies. But of course, she went beyond that as well. I mean, she raised retaliation with the Student Honor Council. She raised it with the Faculty Appeals Commission. She raised it in the administrative Title IX review. And so it was. But then we'd be saying that, I mean, maybe this is where you need your cat's paw. The school retaliated against her because she reported to the harasser? I mean, usually it's this you report to the school. Right. And then the school retaliates against you. Right. But here you're saying she reported to the harasser. Stop harassing me. And the Honor Council retaliated against her? Yes. Well, that's right. Why? Ultimately, the school. That's weird. That's exactly where cat's paw comes in. I mean, ultimately, one comment, the Honor Council isn't the last word on this, right? I mean, the final decision by the school Faculty Appeals Committee to expel Ms. Bowes is the final decision. And so, yes, in this case, you have the school, we all agree, taking the adverse action. And that adverse action is based on discrimination. And the reason for that is the. The adverse action here is the expulsion. Is the ultimate expulsion. It's not having to go through the honor proceedings on a false theory. I haven't thought about that question. I just don't think that's necessary. I mean, we have such a clear adverse action in this case, which is the expulsion. The only point I wanted to make is that it's the ultimate expulsion. It wouldn't be right to look at and say, okay, it's just specifically the Honor Council, the student-run body. And so what you have here is the school ultimately adopting the recommendation of the biased subordinate. And there is discrimination baked right into that decision. So does it matter when, since yours isn't a, I guess it's a willful blindness notice. They had notice, but they were willfully blind to it. Does it matter when the school itself got the notice? And when did they get the notice? I think globally in terms of thinking about the law, it certainly matters. But in this case, the school got notice. And this is most succinctly stated in our reply brief at page four. But the school got notice at the Honor Council hearing, arguably when she reported to Dr. Beha, because he was a mandatory reporter. If you look at Rhodes' internal procedures, it states that any report to a professor qualifies. But you dropped your breach of contract claim. We have, right. But I think I'm just walking through the timeline here. So the report to him, and then at a minimum the report to the Honor Council hearing, the Honor Council itself, the report to the Faculty Appeals Committee, and then further discussion of this point in the Title IX administrative plan. Was there evidence, did she present evidence at the Honor Council that the documents were made up or that these were retaliated, I mean that the documents were contrived as part of this scheme to get her kicked out by him? The answer to that question is no. But just bear in mind that the Honor Council hearing occurred, I think, two weeks, two or three weeks after the initial allegation. The only thing she knew at that point was that she had been accused of cheating in organic chemistry too. So she only raised it at that closing argument that she made? Is that right? She raised it at the closing argument, but she also raised it under cross-examination. So Dr. Beha, and I see I'm out of time, so I'll reserve my time after answering this question. Dr. Beha cross-examined Appellant Bowes, and she raised it then as well. I'd like to preserve the balance of my time. Thank you. Good morning. I'm Lisa Kropika, and with my partner Gary Peoples, we represent the appellees, Rhodes College, and Dr. Roberto de la Salud Beha. I will just get straight to your concerns about the floating use of the cat's paw theory in this case. I will say that there was no argument made in the lower court that the Honor Council was on notice that Dr. Beha had a retaliatory motive. In fact, they've— Didn't you say in your reply brief on summary judgment that there was actual notice? We were arguing in the alternative that even if the cat's paw theory did apply, that we—and if you assumed they had notice, that we did not—that the overwhelming evidence was in favor of the cheating allegation. But we did not—there's no factual admission of that. We just argued in the alternative. I mean, it says both the Honor Council and the Faculty Appeals Committee were acutely aware that the plaintiff believed Dr. Beha had a retaliatory motive to accuse her of cheating. Well, that—you know, that's an argument, Your Honor. Maybe in retrospect it was not the best way to state it, but I would say to you that the way—what they're relying on for the Honor Council to have notice is not any of the things she now claims Dr. Beha did to her, that he said she was beautiful, that he asked her to dinner, that he kept pestering her with personal questions, that he visited her lab just to help her out. She didn't mention any of that in the—either in the Honor Council hearing or to the investigator, the Honor Council investigator who interviewed her three times in this case. Did she raise that in the questions to Dr. Beha? No, she did not. She said—she asked him if he remembered meeting her in the parking lot, and he said, no, I don't remember. And so in her closing statement, she said, there is an incident where we were in the school cafeteria, and I was texting on my phone, and Dr. Beha came up behind me and said, is that your boyfriend? That is the only issue she raised in her closing argument before the Honor Council. And she said that after he made that statement, she said, please don't— please don't ask me personal or talk to me about personal matters anymore, and she claims he was angry because of that. That is the sole basis for her claim that the Honor Council was on notice, that Dr. Beha harbored a retaliatory motive against her. Was it raised in this appeal? What did they call the appeal? The Faculty Appeals Committee. I want to make sure the court understands that the proof in the case showed that the Faculty Appeals Committee has no authority to direct the Honor Council to reach a different decision. Its only role is to make recommendations, and in fact, the Honor Council can ignore those recommendations. The Honor Council is the sole decision maker in this case. And I understand, but if she'd raised it before this Faculty Appeals Group, wouldn't they have an obligation to at least investigate this? Not under this scheme, Your Honor. The Title IX investigation was an appropriate opportunity for her to raise this, and she failed to do it. She never told the investigator that Dr. Beha retaliated against her other than by kind of giving her the cold shoulder. She didn't even mention the cheating allegation that he made up the fake answer key after the fact. And that all happens, the Title IX investigation happens after the Honor Code process has run its course. That's correct, Your Honor, but that was Ms. Bose's choice. She didn't actually make the report until after the Honor Council had already expelled her for cheating. And her complaint, her Title IX complaint itself doesn't reference these particular allegations that he had cooked the books in the Honor Council. No, it doesn't, Your Honor. She was specifically asked, why do you think Dr. Beha retaliated against her, and her response was, because I didn't cheat. Wait, that sounds like she did raise it with the Title IX investigator. She did, but she didn't say why she thought that. She said, because I didn't cheat. I see. So I don't know how the investigator could have pursued that if she didn't mention the fact that this fake answer key, which is the whole key to the cheating allegation, was something Dr. Beha concocted after the fact, instead of his testimony before the Honor Council that he drew it up before the fact as a way to establish whether or not she was cheating in his class. Was that theory about making up the answer key after the fact, did she present that to the Honor Council? Did not, Your Honor. Was she aware of the evidence that was going to be used against her? Yes. She was given an elaborate charging document. She was given the investigator's full report. She had, in fact, submitted to the Honor Council an elaborate report showing her thinking on how she reached the answers on each one of the questions on the quiz. She was very well prepared. She called two expert witnesses to say how she could have reached the answers without cheating. When, of course, it was pointed out to him that the answers matched a fake answer key, they both said, oh, well, then I don't know. And that happened at the hearing? Yes. So she didn't know that it matched a fake answer key before the fact? Yes, she did. Oh, she did know that? Oh, yes. Okay. And when is it that you say is first raised? The first? Was it raised with the investigator and wasn't raised before the Honor Council? It was raised before, I would say that it was raised before the Faculty Appeals Committee, but at that point the Faculty Appeals Committee felt that there was strong enough evidence of cheating that the Honor Council decision was fine. But even if they had decided that the Honor Council needed to re-hear the matter, they can only recommend that to the Honor Council, and the Honor Council can reject that recommendation. They didn't do that? So that's the first time it was raised before that committee? I would submit, correct, Your Honor. And they could have sent it back and say, take another look at it. Take another look at it, you're correct. Let's have an investigator, but they didn't do that. But again, you know, the appellant is talking about this independent investigation breaking the chain of causation, and even in a cat's paw theory, well, there was an independent investigation. The Honor Council investigator, before the Honor Council actually charges a person with cheating, they had the investigator interview everybody, look at the evidence. The plaintiff was interviewed, I'm sorry, Ms. Bowes was interviewed three times by the investigator and did not at a single occasion mention anything about sexual harassment. Are you talking about the Title IX investigator or the Honor Council investigator? The Honor Council investigator. Okay, so whoever was investigating cheating allegations. Correct. And then even in the hearing, when Dr. Bea had presented all this, all of his reasoning, they're on quiz four, he found the quiz answer key up and open on his laptop, on midterm three he logged off and she did much more poorly than she had ever done before, and then he did the fake answer key for quiz five. In the face of that, she still does nothing but in her closing statement say, this one incident in the cafeteria, are you texting your boyfriend? What's your best case that they've talked about, the Second Circuit, Papolino case? Papolino was, as I believe you've observed, this is a case where the plaintiff in the case went to his dean and said, this professor is making sexual advances to me. And then a month later, that same professor accuses him of cheating and the dean does nothing. They also said that the faculty that decided the cheating allegation were all aware that this student had accused the professor who was bringing the charges of making sexual advances, and yet they found the student guilty of cheating on what the Second Circuit characterized as specious evidence. That is absolutely not the case here. Does the Second Circuit also say that a reasonable jury could find that the professor initiated the cheating allegations or whatever for a retaliatory motive and suggest that that's actionable? I think that basically they were looking at the notice issue. It was a deliberate indifference case, I would suggest to you, Your Honor. I mean, they found that the dean's inaction, his failure to intervene, and the faculty member's, you know, failure to consider. But they specifically say that it was problematic that the proceedings were initiated for a retaliatory reason by the faculty member, not focused on the ultimate decision maker, but on actually the faculty member. Isn't that the analogy in this case? I don't think so, Your Honor. I think the court focused on the fact that the university in the form of the dean had notice of these allegations and yet allowed the same professor to accuse this student of cheating and did nothing to investigate or to intervene. I believe that was the holding. It was essentially a deliberate indifference case. Yeah, but that's kind of what your opponent is arguing here, too. They're sort of arguing this is a deliberate indifference case. I mean, they would say the Honor Council was on notice. Everybody seems to concede the faculty committee was on notice, and yet nobody did anything. Well, I would suggest, Your Honor, that a deliberate indifference claim has been waived in this case because it was not raised at summary judgment. It was abandoned at the summary judgment stage. There was no response to our argument that we were entitled to summary judgment on any deliberate indifference claim. And, in fact, there was no argument that the Honor Council was on notice at the summary judgment stage. It was all based solely on the idea of cat's paw where the decision-maker is duped by the retaliatory animus of a non-decision-maker. I'd like to ask you one question about the email that Rhodes sent to GW. Yes. Did we know what that said? Did it say, Ms. Bowes has been expelled for academic dishonesty. She's been found guilty of academic dishonesty. Do you know what it said? I don't recall, Your Honor. You don't know. Okay. It would be true that she was expelled. For academic dishonesty. Right. I don't know. I don't believe it was – I think they just told them that she was no longer attending Rhodes College, I believe. Oh, really? That's interesting. Okay. What about – you've made a sort of late-breaking claim on your defamation case of lack of publication. Are we allowed to entertain that claim at this stage? That's not what you argued below. I believe we are. You are, Your Honor, because we are the appellee in this case, and appellate law says that the appellee is entitled to raise any issue that would support the affirmance of the decision below, which is not a privilege afforded to the appellant. If you raised it below. Did you raise the lack of publication below? No. We can raise any ground. You can raise any ground that you raised below. No, we can raise – the appellee can raise any ground. Believe me, you have to raise it below. An alternative ground for affirmance? You're arguing for an alternative ground for affirmance. Correct, Your Honor. Right. You have to give the district court that opportunity, too. Not where we're the prevailing party, Your Honor. We are allowed to assert any claim that would support an affirmance, even if it wasn't raised below. Anything supported by the record is your argument. Yes. We can affirm the district court on any ground supported by the record. In this case, we were given – the case was dismissed on 12B6 grounds. If it hadn't been, then we would have had the opportunity to raise this issue at the summary judgment stage and at trial. And, frankly, we did not raise the no publication issue at the dismissal stage because we felt like it was a fact-specific argument and that it was too early in the case to raise it. But we certainly would have raised it at the summary judgment had it become necessary. And you think there's – having conceded that it's a fact-specific argument, wouldn't it be a little odd for us to affirm a dismissal on those grounds, lack of publication? You think we should send it back? No. The factual record was fully developed at the summary judgment stage, and the facts support that the only publication in this case was within the Honor Council system or between the Honor Council investigator and the Title IX investigator and Rhodes, and so that there was no publication in either case. Honor Council and the Title IX investigator were each agents of Rhodes with a responsibility to receive this information and to – And what about the publication to GW? They're an outside party. It's true. The publication was true. So truth is a defense. Yes. And really, that issue, the publication to GW, was not raised at any point below. It's not in the complaint. It's not anywhere. Well, it's an element of the offense – I mean, of the tort. They have to – I mean, they have to prove publication. Yes, but they never said that the GW communication was defamatory is what I'm saying. I see. Got it. And I would suggest, Your Honor, that the quasi-judicial privilege applies here. This is an open question in Tennessee. The district court believed that the elaborate procedural precautions that the Honor Council uses are similar essentially to those used in private arbitrations. There's no Tennessee case on it, is there? There is not, Your Honor. There's always been a public school or public group or something like that. I would suggest that this particular factual scenario has never been presented to a Tennessee court, so this is your opportunity to instruct us in that issue. What's your best case outside of Tennessee that it's privileged? We have an Indiana case in which the quasi-judicial privilege was used in a similar type of private proceeding, and we believe that that is the right result here. I don't think any case cited by the appellant has anything close to the elaborate procedural protections we have. I know that one of the issues that concerned other courts is the lack of a penalty for perjury, but in this case, Your Honor, lying is a separate offense under the Honor Code at Rhodes College, and in fact the Honor Council in this case enhanced the penalty from suspension to expulsion because of their finding that she had lied during the Honor Council. Is the professor the one that would be subject to a penalty in the Honor Council for lying? I don't believe so. The student could be. How does that work? The professor, I guess, could be fired. If the Honor Council made a specific finding that he had lied in an Honor Council proceeding, I suspect that the college would fire him. Interesting. You delegate a lot of authority to your students. We do, and they really like it, Your Honor.  I actually attended Rhodes College, so I'm drinking the Kool-Aid. All right. Thank you very much. I'm happy to entertain any questions, but I want to just dwell on two points. First, the notice issue, and second, the role of deliberate indifference in this case. With respect to notice, the only fact I think that we agree on in the colloquy about notice is Ms. Bowes didn't talk about retaliation in the investigation that happened in the days following the initial accusation. That's it. Everything after that, there was notice. I would ask the court to bear in mind that in the days following the accusation, all she has is the bare accusation. You have been accused of cheating in Organic Chemistry 2. The more detailed recitation of the charges was given to her on the day of the Honor Council proceeding. She testified it really wasn't until sitting in the proceeding. Did she have the fake answer key? No, she didn't. She didn't have any of that. I'm not certain the exact point she got that, but it wouldn't have been any earlier than the day of the Honor Council hearing. You're saying that the expert witnesses that she presented at the hearing didn't have an opportunity to address the fake answer key issue because they didn't have it? They were able to address it at the hearing. I don't believe they had it in advance of the Honor Council hearing, but the experts were called to do one simple task, which is to say this is a plausible answer that a college undergraduate chemistry student would give to a chemistry exam. And under cross-examination, the doctor— But why didn't she present this retaliation theory to the Honor Council? Sure. I'll give you the court one quote at the Honor Council hearing. She says, Therefore, I think the question is more the chicken and the egg, whether Dr. Bea's fake answer key matches my answer at the hearing. At the closing, after the evidence has come in, but why didn't she present the theory? I mean, this is the last thing she says. She didn't give testimony, Your Honor. What about evidence? This Honor Council proceeding would not remotely pass due process muster if this were a public college under this court's precedence. She was disallowed from essentially giving direct testimony. She was disallowed from having an attorney represent her. She could not have testified on her own behalf? That's right. The presiding student, Mr. Adolph, prohibited her from doing that. So essentially— Yeah, but that's your breach of contract claim, which you dismissed. But that fact is relevant to what we're discussing right now, which is this issue of notice. And so there was notice given at the hearing. There's clear notice given in the Faculty Appeals Committee. And I would ask this court to be careful not to go down the road of accepting this premise that the end of the ball game is the Student Honor Council proceeding. The Faculty Appeals Committee and the Title IX Investigative Committee, which happened after the fact, they have a legal obligation to overturn this if they believe that it's based on sex discrimination. Well, let me ask this question, though. So it has to matter when she raises the claim. Because otherwise, let's say there were three levels of appeal at Rhodes College. So you have the Student Honor Council, and then you have the Faculty Committee, and then you have the president of the university. And so let's say it goes through the Honor Council and the Faculty Appeals Committee, and she says nothing about sexual harassment or retaliation. She's found to be a cheater and to be expelled. And then she goes to the president of the university and at that moment says, oh, there was a sexual harassment claim. Is it your position that at that point, having not raised it below, she can now seek to undo the whole process and they have to start over? I mean, we wouldn't accept that in a court. I think it's different here, of course. I mean, we're not given the discovery and the procedures in advance. And the one disanalogy, if I may, to what you're saying is the last step wasn't the president. The last step was the Title IX investigation. But she didn't allege this in her complaint in the Title IX investigation either. It wasn't in her complaint, but there was a reason for that, which is everything that she had presented to the Faculty Appeals Committee, it was told to her was going to be forwarded on to the Title IX investigators. And the allegations of retaliation were in there, and they were also discussed with the Title IX investigator. So to summarize, the notice is there. It's there at every level. The investigation is not. If this case is just about notice, we win the case. So I would ask the court to reverse the district court on both the defamation ground and the Title IX ground and remand this case for trial. Thank you.